IN THE UNITED STATES BANKRUPTCY COURT
FOR THE STATE OF NEBRASKA

| | | |
|---|---|---|
| In the Matter of: | ) | Case No. BK22-80793 |
| | ) | |
| ARNOLD J. KELLY, JR. and | ) | Chapter 13 |
| CAMILLE L. BREITKREUTZ, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| JEFFREY McSHANNON, | ) | Adv. Pro. 22-8019 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARNOLD J. KELLY, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Order Denying Objection to Discharge and
Granting Objection to Claim**

The plaintiff, Jeffrey McShannon, seeks a judgment against the debtor, Arnold Kelly, Jr. for $117,000, which he contends is excepted from discharge under 11 U.S.C. § 523(a)(2)(A). McShannon also filed a claim in the debtors' bankruptcy case, to which the debtors objected. McShannon appeared pro se. The debtors appeared through their counsel, Ronald Hunter. The matters were tried together. Because McShannon did not establish the existence of the debt and did not meet his burden of proof under § 523(a)(2)(A), judgment is entered in favor of the defendant on plaintiff's complaint, and the debtors' objection to claim is granted.

**Findings of Fact**

*McShannon's Testimony*

McShannon's stepdaughter is Kelly's wife. McShannon contends Kelly approached him at a graduation party for a family member in early 2018. At the party, Kelly represented he had a friend who worked at a bank. The bank was selling foreclosed real estate. McShannon, who had significant experience with real estate, including purchasing, owning, and managing rental properties, and working as a general contractor, was interested. Kelly represented if each contributed $75,000, they could purchase fifteen houses and three lots. Kelly would handle everything and orally guaranteed McShannon's investment.

McShannon paid Kelly $25,000 as a down payment on April 17, 2018. By May 17, he paid Kelly a total of $71,000.[1] After the initial real estate offering, Kelly represented the banker offered to sell them three more houses and twenty more lots for $20,000 per person. McShannon agreed and paid Kelly $26,000 total in September and October.[2] At some point Kelly represented they could obtain twenty more houses and seven more lots for $75,000 each. McShannon did not have the money. Kelly suggested McShannon pay what he could. Kelly agreed to cover the rest. McShannon paid Kelly at least $7,500 in cash and $11,000 by check in early February 2019.[3]

McShannon requested his money back several times in 2018 and 2019 but did not press the issue because he was busy working on his own rental properties over the months. At some point, Kelly told McShannon the money was invested in commercial real estate and inventory, not houses. The final time McShannon demanded his money, Kelly told McShannon that McShannon would not be repaid because the statute of limitations ran on the debt. Kelly then thanked McShannon for "contributing to my retirement fund".

McShannon supported his claims with paper receipts for his cash payments signed by Kelly. In addition to amounts, the receipts contain references including "houses investments", "investment houses", "property", and "investment". McShannon also offered a fill-in-the-blank power of attorney document with his own handwriting added. The document is signed by both McShannon and Kelly and is dated February 3, 2019. In the document, McShannon purports to give Kelly the power:

> To purchase 70 properties with my 117,500.00 investment. Then sale 44 properties at 820 m. Remainder of properties to be split 50/50 along with money from sale split 50/50. I am promised to walk away with 375 M[4] cash and 13 propert [sic]
>
> ….
>
> Completion date 2-14-2019 of property sales and divide of profit or now

(Doc. #44).

---

[1] After the $25,000 payment by check, McShannon paid Kelly $15,000 in cash on April 18; and $10,000 by check on April 20. He made additional cash payments of $10,000 on April 23; $6,000 on April 27; $1,000 on May 12; and $4,000 on May 17.

[2] The $26,000 included $6,000 by check on September 19; $4,000 by check on September 27; $7,000 in cash on October 20; and $9,000 in cash on October 29.

[3] The parties dispute the total amount of payments. McShannon contends the total was $117,000, and Kelly contends it was $104,500.

[4] McShannon contends Kelly modified the power of attorney with correction fluid, changing what was supposed to be $375 thousand to $375 million. It is not clear when Kelly purportedly made these changes as McShannon possessed the original at trial.

*Kelly's Testimony*

Kelly admits receiving $104,500 from McShannon. They agree on little else. Kelly contends they never agreed to purchase real estate. Kelly would not purchase real estate because he has no experience with it. He knows nothing about investing in or flipping houses. Kelly's business was personal property. From 2010 through 2021 Kelly bought and sold personal property he obtained from estate sales and foreclosed storage lockers. Kelly operated his business online and out of a warehouse. McShannon knew of Kelly's business and wanted to participate. They agreed to purchase the contents of storage lockers, pooling their money, and dividing the contents. They attended auctions of over 100 units together in 2018 and 2019. To support his claims, Kelly offered photographs of his leased business premises, of items of personal property purchased, and of McShannon at storage units.

Kelly explained the references like "houses investments" on the cash receipts. They referred to investments McShannon was making in his own houses and rental properties. McShannon purchased storage lockers, in part, to find personal property to improve or furnish his rental properties. McShannon received tools, tile, and sinks for the rental properties, furniture and other property he used for the rental properties and his own house, and other property he thought he could resell. In rebuttal, McShannon contends he did not need personal property.

Kelly admits his signature is on the power of attorney. He contends it was a form they discussed early in their relationship, but never used. He contends McShannon added the handwritten text after the fact. The original document was in the possession of McShannon during the trial.

## Conclusions of Law

Whether McShannon has a claim in the debtors' bankruptcy case is primarily a question of state law. McShannon timely filed his claim. A filed proof of claim is prima facie valid. *See Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004). McShannon's proof of claim states it is on account of "money lent".

To defeat the claim, the debtors must establish an exception to allowance under 11 U.S.C. § 502(b). The debtors assert there is no underlying basis for the debt. *See* 11 U.S.C. § 502(b)(1) (stating a claim is allowed except to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."). Once the debtors produce evidence to rebut the claim, "the burden of proof shifts to the claimant to produce evidence establishing the validity of the claim." *Consumers Realty & Dev. Co., Inc. v. Goetze (In re Consumers Realty & Dev. Co., Inc*.), 238 B.R. 418, 423 (B.A.P. 8th Cir. 1999) ("Thus, once an objection is made to the proof of claim, the ultimate burden of persuasion as to the claim's validity and amount rests with the claimant.").

McShannon also seeks a money judgment against Kelly. As grounds for the judgment, during trial McShannon stated it was on account of a breach of contract. But McShannon cannot recover a judgment for breach of contract in the adversary proceeding. He did not plead a breach of contract claim. "A party is no more entitled to recover upon a claim not pleaded than he is to recover upon a claim pleaded but not proved." *Armstrong Cork Co. v. Lyons*, 366 F.2d 206, 208 (8th Cir. 1966). Instead, McShannon pled a claim for fraud in connection with a contract, which is separate from a claim for breach.

> A party who fraudulently induces another to contract and then also refuses to perform the contract commits two separate wrongs, so that the same transaction gives rise to distinct claims that may be pursued to satisfaction consecutively.

*Nathan v. McDermott*, 945 N.W.2d 92, 106 (Neb. 2020) (citation omitted).

In the adversary proceeding McShannon seeks to have his claim excepted from discharge, which is a separate consideration. An action under state law to establish a debt is separate from a determination of the dischargeability of the debt in bankruptcy. *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 609 (B.A.P. 8th Cir.1997).

The bankruptcy discharge is the vehicle through which the Bankruptcy Code gives honest but unfortunate debtors a fresh start. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). The Code contains various exceptions from discharge. These exceptions are "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Willmar Elec. Servs. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018) (citing *Community Fin. Grp. v. Fields (In re Fields)*, 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014)). McShannon asserts his claim is excepted from discharge under 11 U.S.C. § § 523(a)(2)(A). Under § 523 a debtor is not discharged from a debt "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). McShannon alleged all three occurred.[5] The plaintiff has the burden to prove each element of a claim under § 523 by a preponderance of the evidence. *Willmar Elec. Servs.,* 592 B.R. at 349.

The three grounds under § 523(a)(2)(A) are similar but are not identical. A false pretense involves an "implied misrepresentation or conduct intended to create and foster a false impression." *Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). To prevail on a claim of false representation, the plaintiff must establish:

---

[5] Although McShannon did not assert a claim for breach of contract, it does not affect the issue of the dischargeability of McShannon's claim because "[s]imple breach of contract . . . is not included in the limited exceptions to discharge in bankruptcy." *Groth Servs. v. McDowell (In re McDowell)*, 299 B.R. 552, 555 (Bankr. N.D. Iowa 2003).

>(1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

*In re Dailey*, 592 B.R. at 349. "[A] debtor's promise related to a future act can constitute a false representation where the debtor possesses no intent to perform the act at the time the debtor's promise is made." *Id.* at 350.

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid*. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

One of the elements of § 523(a)(2)(A) involves the defendant's state of mind or intent. Establishing intent does not require proof of "malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." *AGP Grain Coop. v. White (In re White)*, 315 B.R. 741, 748 (Bankr. D. Neb. 2004) (citing *Moen*, 238 B.R. at 791). Direct proof of intent is often impossible to obtain. Therefore "the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 815 (B.A.P. 8th Cir. 2011) (quoting *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1287 (8th Cir. 1987)). Circumstances may include various "badges of fraud". *See First Neb. Bank v. Balfour (In re Balfour)*, 2020 WL 412184, at *9 (Bankr. D. Neb. Jan. 24, 2020) (providing non-exclusive list of badges of fraud). McShannon did not offer evidence supporting a confluence of multiple badges of fraud. But an intent to deceive "will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act." *Moen*, 238 B.R. at 791. In this case proof of intent comes down to whose testimony is accepted as true.

The court finds the parties agreed to purchase storage lockers with pooled funds, and to divide the contents, which agreement was performed. Kelly and Kelly's testimony is more credible than McShannon and McShannon's testimony.[6] The parties knew each other and are family by marriage. McShannon had experience with real estate. Kelly had none. It is more likely McShannon gave Kelly money to

---

[6] Kelly, although more credible, leaves questions unanswered. For example, one would expect a storage locker foreclosure to be bid in certain increments, such as tens or hundreds of dollars. Why were all the payments in even thousands? Why was there not a payment of $2,200, or $1,350?

purchase storage lockers, which was within Kelly's area of competence. McShannon was working on his rental properties for long periods of time which connotes him making improvements and needing personal property like sinks, tile, and furniture.

McShannon's testimony regarding the cost to purchase real estate does not make sense. McShannon had significant experience with real estate and was knowledgeable about real estate values. An agreement to purchase 70 parcels of property, including several houses, for $117,000 is not credible. His claim the parties were going to flip or sell 44 properties within 11 days is also not credible. The amounts McShannon actually paid Kelly do not support McShannon's testimony. If the price for real estate was $75,000 each as McShannon contends, why did McShannon pay only $71,000? If the second set of properties cost $20,000, why did McShannon pay $26,000? The number of and timing of payments also do not fit. McShannon had cash available. Why did he make partial payments over a few days? The total amounts paid, and the timing of the payments are consistent with an agreement to purchase multiple storage lockers at daily auctions.

The power of attorney does not appear authentic. McShannon accused Kelly of whiting out provisions and writing in new ones. But McShannon had the original document, not Kelly. It is not clear the document was ever delivered to Kelly. Kelly denied ever seeing the completed document. It is more likely McShannon modified the power of attorney to fit his version of the facts. The other documentary evidence, the receipts, are also not dispositive. It is not unbelievable the "investments" referenced were in tile, sinks, tools, and furniture to improve McShannon's existing houses.

## Conclusion

The relief McShannon seeks in his complaint for objection to discharge (Doc. #1; AP 22-8019) is denied. The debtors' objection to claim in their bankruptcy case (Doc. #12; BK 22-80793) is granted.

Dated: January 30, 2024

BY THE COURT:

/s/ Brian S. Kruse
Brian S. Kruse
Bankruptcy Judge

Notice given by the court to:
*Jeffrey McShannon
*Ronald A. Hunter
U.S. Trustee

*Movant is responsible for giving notice to other parties if required by rule or statute.